UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
JUSTIN McCLARIN

   -v-                                        **MEMORANDUM OPINION**
                                               Case No. 16-cv-6846 (FB)

THE CITY OF NEW YORK, DAVID
GRIECO, MICHAEL ARDOLINO,
DAVID QUATTROCHI, WILIAM
SCHUMACHER, & SGT. ROBERT
MARTINEZ,

------------------------------------------------x
Appearances:
  *For the Defendant*:                    *For the United States of America:*
  EYLAN SCHULMAN                        VALERIE ELIZABETH SMITH
  Schulman Law                                NYC Law Department
  700 Broadway,                                  100 Church Street,
  Woodside, NY 11377                    New York, NY 10007

**BLOCK, Senior District Judge:**

      Plaintiff Justin McClarin asserts federal- and state-law causes of action against the City of New York ("City") and five New York Police Department officers ("Officers") for claims arising out his arrest and the search of his Brooklyn apartment in December 2015. The City and Officers (together, "Defendants") moved for Rule 56(a) summary judgment with respect to all claims, and by June 5 Order, this Court directed the entry of judgment in favor of Defendants on three claims, denied summary judgment on all other claims, and explained a written decision would follow.

* * *

1

## I. Statement of Facts & Factual Disputes.

The parties do not dispute that, at approximately 3 a.m. on December 13, 2015, members of the NYPD 75th Precinct arrested Plaintiff at his 393 Warwick Street apartment in Brooklyn. Nor do they dispute that third-party Samantha Miranda was also at the apartment at the time, nor that in the hours immediately before Plaintiff's arrest police received at least one report of a female hostage at 322 Warwick Street.[1] There are genuine disputes as to most everything else, including:

i. *which NYPD officers were involved*;

- Plaintiff alleges NYPD Officers Michael Ardolino, William Schumacher, David Quattrochi, Sergeant Robert Martinez, and Detective David Grieco all participated in his arrest as well as the warrantless entry and search of his apartment. Plaintiff alleges (i) that he was asleep when police started "banging" on the basement door, *see* Pl.'s Rule 56.1 Statement at ¶132; (ii) that Ardolino kicked the door off its hinges, *id.* at ¶142; (iii) that Grieco entered the apartment first, grabbed Plaintiff and handed him to another officer (possibly Schumacher), *id.* at ¶146; (iv) that Martinez was also present and entered the apartment after Grieco, *id.* at ¶136; and (v) that Quattrochi handcuffed and thereafter "judo-swiped" Plaintiff, knocking Plaintiff to the ground and "pop[ing]" his right shoulder "out of place," *id.* at ¶¶172–175.

---

[1] Plaintiff admits that police received a 911-report of a female hostage, but disputes the call credibly led police to Plaintiff's apartment since it reported an incident at 322 Warwick Street (a non-existent address), whereas Plaintiff's address was 393 Warwick Street. Pl.'s Opp'n at 18. Defendants counter that Miranda's aunt, Marisol Lopez, corroborated the hostage report from the 911-call and "pointed out 393 Warwick St., as the location where Ms. Miranda was being held in the basement." Def. Mem. at 12–13. At bottom, there is no genuine dispute that prior to Plaintiff's arrest police received at least one report of a female hostage at a Warwick Street apartment.

- Defendants concede that Ardolino, Schumacher, Martinez, and Grieco were at 393 Warwick for Plaintiff's arrest, but contest that Quattrochi was present or otherwise interacted with Plaintiff on December 13, 2015, *see* Defs.' Rule 56.1 Statement ¶66.

ii. *what Officers heard and/or saw at 393 Warwick, <u>before</u> entering the apartment*;

- Both Grieco and Martinez reported seeing Miranda (or a "female") prior to entering the apartment, though they differ in "when" or "how": Martinez attested to seeing Miranda only once when she "opened the [basement] door," Martinez Dep. at 90:7-25 (cited by Defs.' Mem. at 29), while Grieco recalled only that he saw a "female" "at some point," and that he "[n]ot sure" if the observation came "[t]hrough [a] window or after the door was opened." Grieco Dep. at 177:3-13 (cited by Defs.' Mem. at 29) [2]

- While Martinez testified Miranda opened the door, Martinez Dep. at 90:7-25, Grieco testified that he "believe[d]" Plaintiff opened the door. *Id.* at 177:24-25. For his part, Plaintiff testified that neither he nor Miranda opened the door, but that the Officers kicked the door open. McClarin Dep. at 145, 153:14-22.

- Martinez is the only officer who reported hearing yells from inside the apartment, attesting that when Miranda opened the door Plaintiff "scream[ed] 'Close the door. Close the door. Don't let them in. Don't let them in.'" Martinez Dep. at 90:7-25, 91:19-92:2.

---

[2] Notwithstanding Defendants' representations otherwise, Defs.' Mem. at 29, neither Martinez nor Grieco testified seeing "visible injuries" on Miranda before entering the apartment. The portion of Martinez's testimony that Defendants cite relates to a conversation between Martinez and Miranda that occurred *after* the Officers entered Plaintiff's residence, Martinez Dep. at 98:4-15, and so bears no weight on the issue of whether Defendants reasonably believed exigent circumstances existed prior to their warrantless entry.

3

   iii.    *the condition of the apartment*;

- Defendants cite the "deplorable conditions in the basement" as supporting probable cause to arrest. Defs.' Mem. at 13–14. Martinez testified that the apartment "was a complete mess. The room had damage to it, holes in the wall. There was clothes on the floor. There was food on the floor, half eaten, uneaten. I mean it was filthy." Martinez Dep. at 111:10-15. Similarly, Schumacher testified "[i]t was really, really, really dirty. There was a boiler room door open with paint buckets and paint pans in there" and affirmed "[t]here was [s]heetrock on the floor" and "holes in the walls." Schumacher Dep. at 107:2-16.

- Plaintiff contends the Officers bear some responsibly for the poor condition, and Miranda testified that "[t]he cops . . . were really kicking the door down and the hinges [on] the door broke open" at which point the Officers "run right past me straight into my room and they start kicking the walls down. They start ripping the walls off. They grab my fan. They threw it. My heater. Everything in my room was destroyed and they didn't say nothing to me. They just kept breaking everything." Miranda Dep. at 24:4-24.

   iv.    *what Miranda told police after they entered the apartment;*

- The Officers represent that shortly after entering the apartment Miranda informed them "[McClarin] was holding her against her will," he "kept getting her high, shooting her up with heroin," he "use[d] physical force to abuse her," Martinez Dep. at 98:4-15, "[made] her shower in [the apartment's boiler room]," Martinez Dep. at 38:2–5, made her "go to the bathroom in empty milk containers and bath[e] herself in dirty water in . . . empty turkey trays," and that she "sustained injuries from [McClarin]." Ardolino Dep. at 137:17-24.

- Miranda urges that she did not make such statements to police, and that when Ardolino asked if she was being held hostage she "started laughing" and "said no[,] I live here," "[t]his is my home" and "[n]obody is holding me here against my will"—to which "[Ardolino] says you're lying. I said no, I'm not," Miranda Dep. at 25:4-13, "and [Ardolino] just kept going back and forth with me and then [Grieco]

4

>telling me I'm getting locked up and I'm doing 20 years. Asking me about a gun I don't know anything about. Nothing. There's no gun in my house," *id.* at 27:6-11.

v. *what contraband (if any) was inside the apartment at the time.*

- Defendants report that a protective sweep of the apartment recovered multiple cellphones, four ounces of crack cocaine, drug paraphernalia (scales), and 34 bullets. Defs.' Rule 56.1 Statement ¶43–44; Ardolino Dep. at 121, 124. Plaintiff's arrest report and criminal complaint, signed by Ardolino, reflect four charges for kidnapping-related offenses and three charges for drug-related offenses, but no charges on ammunition-related offenses. Defs.' Rule 56.1 Statement ¶67.

- Plaintiff maintains "Defendants planted the ammunition and narcotics in the basement bedroom," Pl.'s Mem. at 25, citing (1) Miranda's deposition testimony that the recovered bullets "did not come from my house," [t]here was no bullets," [t]here's none of that," Miranda Dep. at 38:6-11; and (2) deposition testimony from a third-party, Desmonn Beckett, who reported seeing Grieco and Schumacher enter a different apartment at 399 Warwick Street shortly before Plaintiff's arrest and recover the same 4 ounces of crack cocaine that was later attributed to Plaintiff. Beckett Dep. at 34:21-35:25

These factual disputes cannot be resolved on a motion for summary judgment; at a minimum they involve issues of witness credibility and "[i]t is axiomatic that courts should not assess credibility on summary judgment." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 476-477 (S.D.N.Y. 2003) (citing *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[T]he court should not weigh evidence or assess the credibility of witnesses [at summary judgment]. These determinations are within the sole province of the jury.").

5

**II. Standard.**

Summary judgment is appropriate if no genuine issue as to any material fact exists and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). "No genuine factual issue exists when the moving party demonstrates, on the basis of the pleadings and admissible evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no reasonable jury could find in the non-movant's favor." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.2d 81, 86 (2d Cir. 1996).

**II. Discussion.**

Plaintiff asserts § 1983 and New York state-law claims against the Officers for unlawful entry, false arrest and state-law unlawful imprisonment, excessive force and state-law assault and battery, failure to intervene, malicious prosecution, and state-law supervisory liability. He also asserts *Monell*-liability and state-law *respondeat superior* claims against the City.

a. Unlawful entry.

The warrantless entry and subsequent search of a residence is presumed unlawful *unless* justified by "exigent circumstances" like the need to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *see also Kerman v. City of New York*, 261 F.3d 229, 235 (2d Cir. 2001) ("police officers may

6

enter a dwelling without a warrant to render . . . assistance to a person whom they reasonably believe to be in distress") (citation omitted).

Whether the Officers reasonably believed exigent circumstances existed here depends, at least, on (i) what information the Officers received via the 911-report and, later, from Miranda's aunt Marisol Lopez; (ii) what (if anything) police observed or heard at the apartment prior to their warrantless entry; and (iii) the credibility and relative weight assigned to Officers' testimony about when (if ever) they perceived there to be an "emergency," *see, e.g.*, Martinez Dep. at 60:21-23 ("Q. When [the aunt, Lopez] pointed out the location of the house, did you consider it [an] emergency at that point? A. No."), Grieco Dep. at 169:20-22 ("Q. [When you got to 393 Warwick] [d]id you believe it was an emergency situation at that point? A. I wouldn't say emergency."). As those issues remain genuinely disputed, summary judgment is inappropriate on this claim.

b. False arrest & state-law unlawful imprisonment.

For "both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable." *Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007). For purposes of qualified immunity, an officer need only possess "arguable probable cause." *Escalera v. Lunn*, 361 F.3d 737, 742 (2d Cir. 2004). Unlike probable cause "in fact"

7

that exists if the "facts and circumstances" known to police "are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed," *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007), "arguable" probable cause exists so long as "officers of reasonable competence *could disagree* on whether the probable cause test was met." *Escalera*, 361 F.3d at 742 (emphasis added).

Here, Defendants insist they had probable cause to arrest Plaintiff given the 911-call, the report from Marisol Lopez, Miranda's statements to police, and the Officers' own observations of (a) Miranda's injuries, (b) the contraband inside the apartment, and (c) the apartment's "condition." Defs.' Mem. at 13; *see also* Martinez Dep. at 98:4–15 (testifying "[Miranda] had some kind of markings on her face"); Grieco Dep at 182:13-16 (testifying Miranda appeared "emotional [and] I remember the injuries"); Ardolino Dep at 182:8–9 (testifying "[t]here were visible injuries" on Miranda).

The presence of contraband, the apartment's condition, Miranda's statements, and portions of the 911-call are all disputed. *See supra* Part I. However, there is no dispute that prior to Plaintiff's arrest, the NYPD received at least one report of a female hostage at a Warwick Street apartment, nor that the Officers observed "some kind of markings" on Miranda's face after they entered the apartment. It cannot be said that *no* officer would have made the decision to arrest Plaintiff given that

8

information. *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989) (police "function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence"). As such, the Officers are entitled to qualified immunity against Plaintiff's § 1983 false arrest claim.

c.  Excessive force.

Whether a given use of force is excessive depends upon the factual circumstances that confront police at the time, "the nature and quality of the intrusion on the individual's Fourth Amendment's interests," and "the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal citation omitted). New York assault and battery claims are "substantially identical" to federal excessive force claims and should be dismissed if the corresponding federal claim fails. *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009), *cited by Graham v. New York*, 928 F. Supp. 2d 610 (E.D.N.Y. 2013).

Plaintiff alleges two instances of excessive force. First, that shortly after being handcuffed Quattrochi "slamm[ed] Plaintiff . . . into the pavement, causing a shoulder dislocation," Am. Compl. at ¶ 66, and second, that "[w]hile in the 75th police precinct following the arrest" an unidentified police officer "repeatedly shot [Plaintiff] with a b.b. gun," *id.* at ¶ 67. The claim involving Quattrochi survives summary judgment; the latter claim involving the b.b. gun does not.

9

As to the purported use of force by Quattrochi, there is a genuine dispute of material fact over whether the officer was present at 393 Warwick Street when the use of force ostensibly occurred. *See* Defs.' Rule 56.1 Statement at ¶ 66 ("Defendant Quattrochi did not see or interact with plaintiff on December 13,2015."). However, the record shows Plaintiff received treatment and was prescribed pain medication for an injured shoulder in the days after his arrest—though Plaintiff did not receive a dislocated shoulder diagnosis. Pl.'s Rule 56.1 Statement at ¶¶91-93. These issues of fact bar resolving this claim on a motion for summary judgment.

As to the b.b.-gun incident, Plaintiff posits the abuse occurred at the 75th precinct but otherwise fails to allege (much less prove) details of the incident or even identify which officer (let alone which Defendant) was responsible. Absent evidence that a Defendant "directly participat[ed]" in the alleged-abuse, this theory of unlawful force fails and Defendants are entitled to summary judgment as a matter of law. *See Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (liability for § 1983 claims "requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal").

d.  Malicious prosecution.

For malicious prosecution claims under "Section 1983 and New York State law, a plaintiff is required to demonstrate: (i) the commencement or continuation of a criminal proceeding against her; (ii) the termination of the proceeding in his favor;

10

(iii) that there was no probable cause for the proceeding; and (iv) that the proceeding was instituted with malice." *Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016) (citations and quotation marks omitted). The probable-cause inquiry on such claims looks to the "facts known or reasonably believed at the time the prosecution was initiated." *Carson v. Lewis*, 35 F. Supp. 2d 250, 263 (E.D.N.Y. 1999). Still, a malicious prosecution claim will fail if there was probable cause to arrest "*unless* . . . plaintiff can demonstrate mitigating facts," such as that police "misrepresented or falsified evidence . . . or otherwise acted in bad faith" to secure a criminal complaint. *Id.*[3]

Viewing the evidence in Plaintiff's favor, a reasonable jury could well conclude that Plaintiff was the subject of a criminal proceeding, *see Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("police officers can 'initiate' prosecution by filing charges"), and that the grand jury's "No True Bill" on two charged-offenses constituted a favorable termination for Plaintiff (but we make no

---

[3] That police had "arguable" probable cause to arrest Plaintiff does not mean they had probable cause to prosecute. *See* Part II.b. Unlike in false arrest claims, there is no "arguable" probable cause inquiry for malicious prosecution claims, and in any event the probable cause inquiry for false-arrest claims concerns only the facts known to police *at the time of arrest*, whereas malicious prosecution claims may rise or fall based on events that occurred after arrest, such as police misrepresenting or fabricating evidence. *Bloom v. Town of New Windsor Police Dep't*, 234 F.3d 1261 (2d Cir. 2000) ("Subsequent to the arrest, the initial probable cause can be negated.").

assessment as to the remaining counts dismissed as part of a sealed disposition). Defs.' Rule 56.1 Statement at ¶ 69.

Nevertheless, genuine disputes of fact—such as whether the Officers misrepresented evidence in the arrest report, *see* Pl.'s Rule 56.1 Statement at ¶193 ("Miranda affirmed . . . she never informed Defendant Ardolino that Mr. McClarin committed the acts alleged")—preclude an assessment of whether probable cause supported Plaintiff's prosecution and/or whether the criminal action was "instituted with malice." *Mitchell*, 841 F.3d at 79; *accord Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) (if "probable cause for the charges against the plaintiff[] was lacking," "that finding alone would support an inference of malice"). Accordingly, Defendants' motion for summary judgment on this claim is denied.

e. <u>Failure to intervene.</u>

Liability attaches if police "fail to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Morris v. City of New York*, 2015 WL 1914906, at *5 (E.D.N.Y. 2015); *see also Sabrina v. Tezlof*, 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016) (liability attaches if officer "observes or has reason to know . . . that a citizen has been unjustifiably arrested").

Whether any Officer had "reason to know" Ardolino lacked probable cause to arrest Plaintiff depends on the resolution of disputed issues of fact—namely, whether

any Officer knew or should have known that "drugs confiscated from 399 Warwick St. were planted in 393 Warwick St. by Defendant Grieco" or that "Defendant Ardolino coerced a false statement from Ms. Miranda." Pl.'s Opp'n at 38. As before, summary judgment is not the appropriate vehicle for resolving those issues; Defendants' motion for summary judgment on this claim is denied.

f. Supervisory liability (against Martinez only).

A supervisor may be subject to additional liability if they are a "direct participant in" or otherwise "authorize[], order[], or help[] others to do . . . unlawful acts." *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014). Resolving the lawfulness of the Officers' acts—warrantless entry, use of force, and Plaintiff's arrest—necessarily involves an assessment of the probable cause (or lack thereof) for each, and as we make no final determination as to probable cause at this stage, we deny the motion for summary judgment on this claim.

g. *Monell* & state-law *respondeat superior* liability (against the City).

To hold the City liable under § 1983, Plaintiff must demonstrate a policy or custom of the City of New York caused the deprivation of his federal or constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). Plaintiff fails to do so, adducing no evidence that the NYPD had a policy or was "deliberately indifferent" to warrantless searches, arrests "without probable cause,"

13

or the "improper conduct by . . . members of the NYPD's 75th police precinct." Am. Compl. at ¶¶49–52. Accordingly, Plaintiff's *Monell* claim against the City fails.

For state-law *respondeat superior* liability, Plaintiff must show that at least one of underlying claims—for false arrest, unlawful entry, excessive force, and malicious prosecution—is viable. *Lozada v. City of New York*, 2013 WL 3934998, at *8 (E.D.N.Y. July 29, 2013) (internal citation omitted). As each of those underlying claim hinges on the assessment of probable cause, we cannot decide *respondeat superior* as a matter of summary judgment.[4]

\* \* \*

In accord with the Court's June 5 Order, Defendants are entitled to summary judgment on Plaintiff's § 1983 false arrest claim, the excessive force claim related to the b.b.-gun incident, and Plaintiff's claim for liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Defendants' motion is denied in all other respects.

                                                          /S/ Frederic Blok
                                                          FREDERIC BLOCK
                                                          Senior United States District Judge

Brooklyn, New York
June 15, 2020

---

[4] As Plaintiff's still has viable federal claims, we need not address Defendants' argument that supplemental jurisdiction is inappropriate over the state claims. *See Lanza v. Merrill Lynch & Co.,* 154 F.3d 56, 61 (2d Cir. 1998) (recognizing state claims should be dismissed if all federal claims have been dismissed).