UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
JUSTIN MCCLARIN,

                Plaintiff,

     -against-

THE CITY OF NEW YORK, DAVID
GRIECO, MICHAEL ARDOLINO,
DAVID QUATTROCHI, WILLIAM
SCHUMACHER, and SGT. ROBERT
MARTINEZ,

               Defendants.
------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 16-CV-6846-FB-SJB

*Appearances:*
*For the Plaintiff:*
RICHARD CARDINALE
26 Court Street, Suite 1507
Brooklyn, New York 11242

*For Defendants Grieco, Ardolino,*
*Schumacher and Martinez:*
ZACHARY KALMBACH
Assistant Corporation Counsel
City of New York
100 Church Street
New York, New York 10007

**BLOCK, Senior District Judge:**

     After a six-day trial, the jury in this § 1983 action returned a verdict in favor

of the plaintiff, Justin McClarin, on his claims for unlawful search and malicious

prosecution, but against the plaintiff on his claims for excessive force and assault

and battery.  The jury awarded a total of $115,000 in compensatory damages and

$775,000 in punitive damages.

     Defendants David Grieco, Michael Ardolino, William Schumacher and

Robert Martinez (collectively, "Defendants") now move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 and, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59.  McClarin, in turn, moves to reinstate his claim against the City of New York under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Familiarity with the factual background and procedural history of the case is presumed and will be referenced only as necessary to elucidate the following discussion of the issues raised by the motions.

## I.     MOTION FOR JUDGMENT AS A MATTER OF LAW

"Judgment as a matter of law pursuant to Rule 50(a) is appropriate when drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of the non-movant, a reasonable jury could only have found for the movant."  *Vermont Plastics, Inc. v. Brine, Inc.*, 79 F.3d 272, 277 (2d Cir. 1996) (internal quotation marks and alterations omitted).  "In considering the evidence, the trial court may not weigh evidence, assess credibility, or substitute its opinion of the facts for that of the jury."  *Id.*

## A.    Unlawful Search

Grieco, Ardonlino and Martinez argue that they are entitled to judgment as a matter of law on McClarin's unlawful search claim because exigent circumstances allowed them to enter McClarin's apartment at 393 Warwick Street without a

wararnt.  As the Court stated in denying summary judgment on that claim,
"[w]hether the Officers reasonably believed exigent circumstances existed here
depends, at least, on (i) what information the Officers received via the 911-report
and, later, from Miranda's aunt Marisol Lopez; (ii) what (if anything) police
observed or heard at the apartment prior to their warrantless entry; and (iii) the
credibility and relative weight assigned to Officers' testimony about when (if ever)
they perceived there to be an 'emergency.'"  *McClarin v. City of New York*, 2020
WL 3183893, at *3 (E.D.N.Y. June 15, 2020).

Most of those facts remained disputed at trial.  Although the officers
received information from the 911 report and Marisol Lopez that Samantha
Miranda was being held against her will, they processed two other arrests before
proceeding to McClarin's apartment.  While on Warwick Stret, the officers came
upon two individuals—Desmonn Beckett and Anthony Modeste—drinking
whiskey.  Modeste was standing on the sidewalk, while Beckett was sitting in the
driver's seat of a parked car.  At Beckett got out of the car, at least one officer saw
a bullet on the floorboard.  The car was searched and a firearm was found in the
truck.  Both men were arrested, Beckett for possession of a firearm and Modeste
for an open-container violation.  Ardolino recalled transporting one of the men to
the 75th Precinct, while Quattrochi took the car and firearm.  The time spent on

these activities would have allowed ample time to obtain a warrant.

At McClarin's apartment, Miranda denied that she was being held against her will.  There was testimony that she had facial injuries, but the officers did not seek medical treatment for her.  In sum, the evidence was sufficient to support a finding "that Officers Grieco and Ardolino and Sergeant Martinez did not believe there was such an emergency, or that their belief was unreasonable."  Trial Tr. at 1008.  The jury's resolution of that issue likewise precludes qualified immunity. *See Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991) (noting that officers' entitlement to qualified immunity required "a reasonable belief that, under the circumstances, their actions did not violate those [Fourth Amendment] rights).

## B.    Malicious Prosecution

Grieco argues that there was not an evidentiary basis for the malicious prosecution verdict against him because the criminal complaint was signed by Ardolino.  However, the Court instructed the jury that "a defendant who is not a prosecutor participates in initiating a criminal prosecution if he creates or gives the prosecutor information which he knows to be false," Trial Tr. at 1011, and there was sufficient evidence from which the jury could reasonably infer that Grieco assisted in planting evidence and pressuring Miranda to write a false statement that McClarin had kidnapped her and forced her to use illegal drugs.  That same

4

inference defeats Defendants' arguments that there was nevertheless probable cause for the prosecution, *see Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice."), and that they are at least entitled to qualified immunity. *See id.* ("Qualified immunity is unavailable where, as here, the action violates an accused's clearly established constitutional rights, and no reasonably competent police officer could believe otherwise.").

Schumacher and Martinez argue that there was insufficient evidence to hold them liable for malicious prosecution on a failure-to-intervene theory.  The Court instructed the jury that "if you find that Officer Schumacher or Sergeant Martinez knew about any false evidence, knew that the evidence would be submitted in support of the criminal complaint against Mr. McClarin, and failed to take advantage of a reasonable opportunity to prevent that evidence from being submitted, then the defendant you are considering is liable for failure to intervene." Trial Tr. at 1017-18.  As previously explained, there was sufficient evidence that Miranda was coerced into signing a statement falsely accusing McClarin of kidnapping and other crimes.  There was, in addition, sufficient evidence that

Schumacher and Martinez knew about the statement and failed to prevent its use in prosecuting McClarin by informing the district attorney that it was false and coerced.  That evidence supports the jury's verdict.  *See Ricciuti*, 124 F.3d at 131 ("A jury . . . might rationally infer that Wheeler and Lopez were jointly involved in a common scheme—a conspiracy to ensure that plaintiffs were detained on false charges.").

## II.   MOTION FOR NEW TRIAL

Even when the evidence is sufficient to support the jury's verdict, a district court may grant a new trial if "it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988).  Such an outcome is usually the result of legal error at trial, but a new trial can also be granted if the verdict is against the manifest weight of the evidence or if an award of damages is excessive. *See Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 174 (E.D.N.Y. 2012). "On new trial motions, the trial judge may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner."  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).  "But where . . . a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except

in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." *Id.* at 418-19.

## A.    Jury Instructions

Defendants argue that the jury instructions were erroneous in four respects.

### 1.    *"Missing Witness"*

First, Defendants argue that the Court's final instructions unfairly contradicted their closing arguments. This argument principally concerns the Court's instruction not to speculate as to how Marisol Lopez would have testified.[1] The Court's usual practice is not to give a specific "missing witness" charge when the witness was—like Lopez—equally available to both parties. Here, however, it was necessary to correct defense counsel's extensive argument that the jury should draw inferences about the substance of Lopez's testimony from the fact that McClarin did not call her. It is true that the failure to call an equally available witness generally leaves the question of the witness's testimony "open to an

---

[1] Defendants briefly challenge the Court's reference to the history of the relationship between McClarin and Miranda. The Court did not, as Defendants suggest, instruct the jury "not to focus" on evidence of threats to Miranda or preclude it from considering that evidence in determining her credibility. Rather, it correctly explained that "your focus is what happened on December 13th, 2015," and even told the jury that "you can consider [evidence about their relationship history] in the totality of the circumstances as to whether or not it bears upon the nature of the relationship [on December 13, 2015], but it may or may not." Trial Tr. at 1020.

inference against *both* parties." *United States v. Erb*, 543 F.2d 438, 444 (2d Cir. 1976) (internal quotation marks omitted; emphasis added).  However, "there is substantial precedent for the charge . . . that the jury may not draw an inference if the witness is equally available." *Id.*

As to whether the parties should be allowed to argue for inference, the Second Circuit has expressed a "'well-deserved reluctance to remove the issue from the sound discretion of the trial judge," in part because of "the usual aura of gamesmanship" that frequently accompanies requests for a missing witness charge as to which the trial judge will have a surer sense than the appellate court." *United States v. Torres*, 845 F.2d 1165, 1171 (2d Cir. 1988) (quoting *Erb*, 543 F.2d at 445).  That gamesmanship was certainly at play in this case.  As far as the record reveals, Lopez's sole role in the incident was reporting that Miranda was being held against her will and leading officers to her location.  The apparent relevance of that testimony was establishing exigent circumstances for a warrantless search.  But instead of letting the jury evaluate Lopez's testimony and credibility, Defendants asked it to draw an inference unfavorable to McClarin.  Seeing no apparent connection between Lopez and McClarin's case-in-chief, the Court was left with the firm impression that Defendants were inviting the jury to speculate as to what Lopez's testimony would have been, while "avoiding any possible

damaging effect from presenting [her] as a witness." *Erb*, 543 F.3d at 445.

### 2. *Malicious Prosecution*

Defendants next argue that the Court's instruction on malicious prosecution defined only the five felonies, as opposed to all twelve crimes, with which McClarin was charged.  The Court frankly explained at the charge conference (outside the jury's presence) that its decision was motivated by a desire to avoid a lengthy and possibly confusing instruction "by focusing on the ones that really obviously cost him his liberty," Trial Tr. at 869—which is, after all, the principal harm flowing from malicious prosecution.

The Court's decision finds legal support in *Posr v. Doherty*, 944 F.2d 91 (2d Cir. 1991), in which the Second Circuit held that it would "not allow a finding of probable cause on [one] charge to foreclose a malicious prosecution cause of action on charges requiring different, and more culpable, behavior," out of concern that a contrary rule could lead "an officer with probable cause as to a lesser offense [to] tack on more serious, unfounded charges which would support a high bail or a lengthy detention." *Id.* at 100.

The same concern was present in this case, as the numerous misdemeanor charges might have supported probable cause but carried no realistic possibility of a high bail or a lengthy detention.  The Court remains satisfied that defining those

crimes would have distracted the jury and that their exclusion did not result in a miscarriage of justice.[2]

### 3.    *Non-Economic Damages*

Next, Defendants argue that the Court incorrectly instructed the jury that it could award damages for "loss of enjoyment of life" because McClarin withdrew his claim for damages for emotional distress.  On the contrary, because emotional distress was not at issue—thus avoiding an examination of McClarin's prior experience with the criminal justice system—the Court told the jury to consider only "the loss of the ability to perform daily tasks, to participate in the activities which were previously a part of [McClarin's] life, and to experience the pleasures of life" for the period of his detention.  Trial Tr. at 1023.  At least in the context of this case, those concepts are distinct from the fear and other psychological harm flowing from a stint in jail, and the Court explicitly told the jury that they were

---

[2]Defendants briefly argue that the Court erred in rejecting their proposed charge that a report of a crime by the victim presumptively creates probable cause. That rule is premised on the assumption that the victim is credible.  *See Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity."). McClarin's theory that Miranda's statement her was coerced directly attacks that premise.

"different from emotional distress." *Id.* There is, therefore, no chance that the jury included such damages in its award.

### 4.   *Punitive Damages*

Finally, Defendants argue that the Court erred in telling the jury not to consider their ability to pay an award of punitive damages. The sole case they cite—*Provost v. City of Newburgh*, 262 F.3d 146 (2d Cir. 2001)—is inapposite because *the plaintiff* in that case challenged the district court's instruction telling the jury that it *should* consider the defendants' ability to pay despite a lack of evidence on that issue. *See id.* at 164 ("In this case, the defendants did not present evidence of their financial circumstances, and the court therefore should not have instructed the jury to consider that issue in calculating a punitive award."). Here, the Court simply told the jury that "it should not consider the Defendant[s'] financial ability to pay such an award." Trial Tr. at 1025. The Court sees no error in instructing a jury *not* to consider an issue on which there was no evidence, particularly since jurors might otherwise be tempted to speculate as to whether and to what extent officers are indemnified for punitive damage awards. Even assuming that Defendants are correct that it would have been preferable to say nothing, the Court does not agree that a single reference in its instructions led the jury to increase its punitive damages award based on speculation that the award

would be paid from a deep pocket.

**B.  Evidentiary Rulings**

In addition to challenging the jury instructions, Defendants argue that three of the Court's evidentiary rulings require a new trial.

### 1.  *Recorded Phone Calls*

The Defendants principally challenge the Court's exclusion of a recording of phone calls McClarin made to Miranda from jail. During cross-examination, McClarin denied that he had "offered [Miranda] money to come testify at this trial." Trial Tr. at 153. He further testified that he had "spoken to Ms. Miranda on the phone recently." *Id.* at 154. Defendants' counsel then asked to play a recording of a phone call. The Court held a sidebar, at which it learned that the recording had not been included on Defendants' exhibit list or disclosed to opposing counsel prior to trial. The Court allowed Defendants' counsel to complete his cross-examination without introducing the recording. During that portion of his testimony, McClarin acknowledged that he had told Miranda that he "could possibly get that much [$300,000]," that he "might have said" he would "let her control it," and that he "[p]ossibly" told her to "just go along with it." Trial Tr. at 166-68. He denied, however, telling her that he was "giving you that money to go testify, please," or that "she would be left with nothing" if she didn't. *Id.* at

166-68.

After completing McClarin's cross-examination, Defendants' counsel played the recording outside the presence of the jury.  In one conversation, McClarin told Miranda, "[W]hatever was get from that [trial] you gonna really have it . . . . But you're still gonna have to um you know do the trial thing."  Defs.' Ex. R (for identification).  In another, he told her she would receive a call from his attorney and to "just go along with it, and then whatever we get . . . you gonna get like 300."  *Id.*  In a third, he said, "[I]f you don't do it then this shit is over . . . You just gotta . . . do your thing, like, I'd rather you get that than leave you out there with nothing."  *Id.*  After discussing the matter further with counsel, the Court acknowledged that "there is no question it is cross-examination material" but that it was not "fairly disclosed" prior to trial.  Trial Tr. at 210.  After confirming that McClarin's counsel objected to admitting the recording, the Court excluded it.  Defendants argue that this was error requiring a new trial.

A jury trial is no small matter, and the Court takes great pains to streamline the process.  Pretrial conferences—particularly the final pretrial conference—are an integral part of that process.  As the Court explained to counsel, it uses those conferences "to deal with any motions in limine that they wish to make."  Trial Tr. at 199.  In the same vein, the Court requires witness and exhibit lists in advance of

that conference to address any objections beforehand and "not waste the court's time" at trial.  *Id.*  The overarching point of this process is to resolve as many evidentiary issues as possible before the trial, so that the parties may simply introduce exhibits as they come up during testimony.  The Courts expects counsel to participate in the process in good faith so that the jury spends as much of their valuable time as possible listening to testimony and seeing exhibits, rather than being distracted by constant objections and sidebars.

The Court's practice was followed in this case.  Defendants filed a lengthy motion in limine on September 14, 2022.  The parties filed their witness and exhibit lists the next day.  Thus, at a pretrial conference on September 22, the Court was able make many evidentiary rulings, as a result of which the parties were able to revise their witness and exhibit lists.  At a second conference on September 23, the Court made additional rulings.

Unfortunately, however, Defendants did not list the recording as an exhibit. Nor did their extensive motion in limine seek a ruling on what was sure to be an objection to the recording.  Instead, Defendants made "a conscious decision . . . not to tell [opposing] counsel about it or not to put it forward on a proposed exhibit list."  Trial Tr. at 200-01.

Their counsel defends his decision on the ground that he was not required to

14

disclose impeachment material.  It is true that the Court's individual rules state that each party is to submit "[a] list . . . of exhibits to be offered in its case in chief." But the same rules state that "[o]nly exhibits listed will be received in evidence except for good cause shown."  The Court's extensive explanation of its pretrial process should have alerted counsel to err on the side of caution or, at the very least, to bring any confusion about what was expected to the Court's attention prior to trial.

Regardless of the strictures of the Court's rules, there is a broader principle at stake.  Trial by ambush has long since fallen out of favor.  *See, e.g.*, *Ginns v. Towle*, 361 F.2d 798, 801 (2d Cir. 1966) ("The basic purpose of the federal rules, particularly those concerning discovery and disclosure, is to eliminate trial by ambush, sometimes called the sporting theory of justice, and avoid the very kind of surprise practiced upon the defense in this case.").  Exempting impeachment material from disclosure obligations must, therefore, not be understood as an invitation to reinstate the practice.  Rather, it simply recognizes the realities of trial practice; as the Court explained:

> when you have cross-examination, sometimes exhibits . . . become relevant which may not have been so apparent before when the court was sitting and speaking to everybody at our extensive pretrial conferences and I allow that type of flexibility.  An example would be a witness says something and nobody had any idea at all what that was, he going to say, it was a total surprise, and then there's some

> evidence that somebody has that may bear upon that.  Well, I allow
> some flexibility about that in the real world.

Trial Tr. at 206.  The recorded phone calls, by contrast, were "a horse of a different

color."  *Id.*  Defendants' counsel had the recording well in advance of trial before

trial and undoubtedly knew (1) that it was going to be a key part of his cross-

examination and (2) that opposing counsel would object to its admission.  By

failing to disclose it, he subverted the entire purpose of the Court's pretrial process.

In sum, the Court's overriding responsibility as a trial judge is to provide all

parties with a fair trial.  As the Court's comments make clear, Defendants' counsel

had excellent arguments that the recording was admissible impeachment evidence.

Despite every opportunity to address the issue earlier, he chose to wait until the last

possible minute to spring the trap.  This struck the Court as a fundamentally unfair

ambush.  Nothing in Defendants' motion for a new trial convinces it otherwise.

In any event, the jury heard other evidence regarding the phone calls.  In

addition to McClarin's own acknowledgment of some of his statements, Miranda

testified that he said "[s]omething, like, about, like, if you go and, like, we win,

this is what will happen and, like, you and my son would be okay."  Trial Tr. at

328.  She did not understand the statement as an offer of money in exchange for

her testimony, but that "he said that because he knows it's nerve racking [sic] for

me to be here."  *Id.*  Their testimony, coupled with extensive evidence of the

history of their relationship, allowed the jury to make a fair assessment of Miranda's credibility.

### 2.    *"Bullethead"*

The Defendants argue that the Court erred in allowing references to Grieco's nickname, "Bullethead."  The Court allowed McClarin to identify Grieco as such because that was the name by which he knew him.  In addition, the Court instructed the jury to draw no inferences from the nickname.  Considering the trial as a whole, the Court cannot agree that the references unfairly prejudiced the jury against Grieco by, for example, leading it to conclude that Grieco's nickname made it more likely that he would plant evidence, coerce false statements, or otherwise disregard McClarin's constitutional rights.

### 3.    *References to the City*

In the same vein, Defendants argue that the Court should not have allowed references to the City of New York during the trial.  In cases where the jury is not considering municipal liability, the Court's practice is to avoid mentioning the City, thereby focusing the jury's attention on the conduct of the individual defendants.  Following that practice, it issued a ruling in limine to that effect in this case.

Despite that ruling, McClarin's counsel referred to "the Government's case"

17

during her opening.  Trial Tr. at 44.  She later asked a witness how many times he had met "with the City Attorneys," leading the Court to comment, "[H]e told you that he did speak with the Government's lawyer, and you can take that . . . for what it's worth."  *Id.* at 456, 458.

Such references are obviously not inherently prejudicial, as they are appropriate in cases involving municipal liability.  *See, e.g., Graham v. City of New York*, 128 F. Supp. 2d 681, 711 (E.D.N.Y. 2015) (denying new trial motion based on *respondeat superior* instruction).  Realistically, they are unavoidable in the heat of trial; as noted, even the Court referred to "the Government's lawyer" on one occasion.  Having presided over the trial, the Court can confidently conclude that the jury—which was, in any event, aware that Defendants were members of the NYPD—did not draw any prejudicial inferences from a few isolated references.

## C.  Court Comments

The Court makes no secret of the fact that it often interrupts counsel's questioning of a witness to clarify what might otherwise be vague, confusing, or meandering answers.  *See Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 991 (2d Cir. 1991) (approving practice of "interpos[ing] relevant questions to witnesses to clarify both legal and factual issues and thus minimize

18

possible confusion in the jurors' minds" (internal quotation marks omitted)).

Defendants argue that this practice deprived them of a fair trial on two occasions.

First, they argue that the Court implied that Ardolino was not credible when it became "visibly frustrated" while asking him questions and ending by saying, "[T]he jury will assess your credibility."  Defs.' Mem. of Law at 32-33.   The Court's "frustration" was with Ardolino's insistence that he could not recall precise times, when the Court was asking only for a general sequence of events.  *See* Trial Tr. at 485 ("THE COURT:  I'm not talking about the exact time.  The jury wants to get a perspective here.").  Relatedly, the Court's comment on credibility followed a lengthy exchange to elicit "whatever you recall" about the timing of the events leading to McClarin's arrest.  *Id.* at 486.  After Ardolino finally testified that it was "a couple of hours" before Lopez took him to 393 Warwick, the Court said, "Next question.  The jury will assess your credibility."  *Id.* at 488.  Given the full context of the exchange, and the repeated admonitions to the jury that credibility was exclusively its province, the Court is satisfied that its questioning of Ardolino did not invite the jury to find him not credible.

Defendants further argue that the Court "downplayed" their theory that Miranda was motivated to lie to protect herself from violence by asking her, "You had some arguments?" and, "The relationship was not a hundred percent?"  Tr. at

333.  Those questions related to a statement written by Miranda in 2017; asked what led her to write the statement, she testified: "That incident, I really don't even remember, like, what we was arguing about or what the situation was.  I don't remember."  *Id.*  Thus, the Court's questions fairly summarized Miranda's own testimony and clearly related only to a single incident.  Other testimony about the overall relationship was more than adequate to make Defendants' point that Miranda's defense of McClarin was typical for a victim of domestic violence.

**D.    Damages**

Finally, Defendants challenge the jury's damages award as excessive in two respects.  First, they argue that the award of $40,000 as compensatory damages for the unlawful search was excessive because McClarin did not specifically testify regarding the search's emotional or psychological impact of him.  The Court nevertheless concludes that other evidence regarding the circumstances of the search and the subsequent condition of McClarin's apartment supports the award.

Defendants also challenge the awards of punitive damages as excessive. The awards in this case —$275,000 for the unlawful search and $500,000 for malicious prosecution—were substantial but must be broken down by defendant. With respect to the search, the jury awarded $75,000 against Grieco, $75,000 against Ardolino, and $125,000 against Martinez.  With respect to the prosecution,

20

it awarded $150,000 each against Grieco, Ardonlino and Martinez, and $50,000 against Schumacher.

In assessing the size of a punitive damages award, the relevant are "the degree of reprehensibility" of Defendants' conduct; "the disparity between the harm or potential harm [and the] punitive damages award"; and the difference between the award and "penalties authorized or imposed in comparable cases." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996); *see also Payne v. Jones*, 711 F.3d 85, 104 (2d Cir. 2013) (applying *Gore* factors but adding that "[c]ourts have often found it helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases"). The Defendants' conduct—particularly the falsification of evidence—is undoubtedly reprehensible enough to support the awards. *See Gore*, 517 U.S. at 575 (describing reprehensibility as "[p]erhaps the most important indicium of the reasonableness of a punitive damages award").

With respect to the second factor, assessing whether a punitive damages award bears a reasonable relationship to actual or potential harm comes down to a comparison with the award of compensatory damages. Although the Supreme Court has repeatedly declined to impose a bright-line ratio, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages,

21

to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).  When broken down by defendant, the ratios here fall within acceptable limits: the punitive damages award against Martinez for unlawful search is 3.125 times compensatory damages, while the ratios for the remaining awards are 2:1 or less.  *Cf. Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 23 (1991) (concluding that ratio of 4:1 was not excessive but "may be close to the line").[3]

Finally, Defendants' conduct may have subjected them to criminal sanctions, but the more important point for present purposes is that the awards fall within a reasonable range for cases of this type.  *See Payne*, 711 F.3d at 105 (noting, in 2013, that "we sustained awards around $150,000" in "egregious" cases).

### III.   MOTION TO REINSTATE *MONELL* CLAIM

McClarin's *Monell* claim was not submitted to the jury because it had previously been dismissed on a motion for summary judgment.  *See McClarin*, 2020 WL 3183893, at *6.  As noted, McClarin moves to "reinstate" that claim. Although the procedural posture of that request is unusual, "[a] district court has

---

[3]The Supreme Court has left open the possibly that double-digit ratios might be appropriate "where a particularly egregious act has resulted in only a small amount of economic damages."  *Campbell*, 538 U.S. at 425 (internal quotation marks omitted).  Given the size of the compensatory awards, that exception is inapplicable here.

the inherent power to reconsider and modify its interlocutory orders prior to the entry of judgment." *United States v. LoRusso*, 695 F.2d 45, 53 (2d Cir. 1982). However, the Court denies McClarin's request on the merits and adheres to its prior ruling that McClarin has not presented sufficient evidence of a policy of deliberate indifference towards the types of police conduct that gave rise to the unlawful search and malicious prosecution in his case.

## IV.   CONCLUSION

For the foregoing reasons, all post-trial motions are denied in their entirety. The Clerk shall enter judgment in accordance with the jury's verdict.

**SO ORDERED.**

 _/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 8, 2023